1  IGNACIA S. MORENO
2  Assistant Attorney General
   Environment & Natural Resources Division
3  United States Department of Justice
4  THOMAS P. CARROLL (D.C. Bar No. 388593)
   Senior Attorney
5  IVAN LIEBEN (California Bar No. 198044)
   Special Trial Attorney
6  Environmental Enforcement Section
7  Environment & Natural Resources Division
8  United States Department of Justice
   P.O. Box 7611
9  Washington, D.C. 20044
10 Telephone:  (202) 514-4051
   Fax:   (202) 514-0097
11 Email: thomas.carroll@usdoj.gov

12 **Attorneys for the United States of America**

13

14 (see next page for additional counsel)

15

16

17        UNITED STATES DISTRICT COURT FOR THE
          EASTERN DISTRICT OF CALIFORNIA
18              FRESNO DIVISION

19

20 UNITED STATES OF AMERICA,          )
21           Plaintiff,               )   Case No. 11-cr-790
22                                    )
23           v.                       )
                                      )   **CONSENT DECREE**
24 CALPORTLAND COMPANY,               )
25           Defendant.               )
26 _____)

27

28

RANDOLPH C. VISSER (California Bar No. 64689)
Sheppard, Mullin, Richter & Hampton LLP
333 S. Hope Street, 43rd Floor
Los Angeles, California 90071
Telephone: (213) 620-1780
Fax: (213) 620-1398
Email: rvisser@sheppardmullin.com

RICHARD G. STOLL (D.C. Bar No. 28001)
Foley & Lardner LLP
3000 K St. NW, Ste. 500
Washington, D.C. 20007-5143
Telephone: (202) 295-4021
Fax: (202) 672-5399
Email: rstoll@foley.com

**Attorneys for CalPortland Company**

1 <u>TABLE OF CONTENTS</u>

2 <u>Page</u>

3
I. JURISDICTION AND VENUE ............................................................................. 2
4
5 II. APPLICABILITY ............................................................................................... 3

6 III. DEFINITIONS ................................................................................................. 4

7 IV. CIVIL PENALTIES......................................................................................... 10

8 V. COMPLIANCE REQUIREMENTS ................................................................... 11

9      A.     Control Technologies ............................................................ 11

10     B.     Emission Limits.................................................................... 12
11
12     C.     Continuous Emission Monitoring Systems ........................... 15

13     D.     Kiln Reagent Injection Monitoring System .......................... 16

14     E.     Alternative Pollution Control Technologies ......................... 16

15 VI. PROHIBITION ON NETTING CREDITS OR OFFSETS FROM
16     REQUIRED CONTROLS ................................................................. 17

17 VII. PERMITS ...................................................................................................... 17

18 VIII. REVIEW AND APPROVAL OF SUBMITTALS ............................................ 20

19 IX. REPORTING REQUIREMENTS ..................................................................... 21
20
X. STIPULATED PENALTIES ............................................................................. 24
21
22 XI. FORCE MAJEURE .......................................................................................... 27

23 XII. DISPUTE RESOLUTION............................................................................... 29

24 XIII. INFORMATION COLLECTION AND RETENTION .................................... 35

25 XIV. EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS ....................... 36

26 XV. COSTS........................................................................................................... 38
27
XVI. NOTICES..................................................................................................... 38
28

XVII. EFFECTIVE DATE .......................................................................... 40

XVIII. RETENTION OF JURISDICTION ............................................... 40

XIX. MODIFICATION ............................................................................ 40

XX. TERMINATION ............................................................................... 40

XXI. PUBLIC PARTICIPATION ........................................................... 41

XXII. SIGNATORIES/SERVICE ........................................................... 42

XXIII. INTEGRATION............................................................................ 42

XXIV. FINAL JUDGMENT ................................................................... 43

XXV. EXHIBITS..................................................................................... 43

Exhibit A:  Control Technology Demonstration Requirements...................…..........48

1 | **CONSENT DECREE**

2     WHEREAS, Plaintiff, the United States of America (the "United States"), on
3 behalf of the United States Environmental Protection Agency ("EPA"), has,
4 simultaneously with the lodging of this Consent Decree, filed a Complaint against
5 the Defendant CalPortland Company ("CalPortland") pursuant to Sections 113(b)
6 and 167 of the Clean Air Act ("Clean Air Act" or "the Act"), 42 U.S.C. §§ 7413(b)
7 and 7477, for injunctive relief and the assessment of civil penalties for violations of:
8 (a) the Prevention of Significant Deterioration ("PSD") provisions of the Act, 42
9 U.S.C. §§ 7470-7492; and (b) Title V of the Act, 42 U.S.C. §§ 7661-7661f, and
10 Title V's implementing federal and California regulations, at a portland cement
11 manufacturing plant located in Kern County, California (the "Facility");

12     WHEREAS, in its Complaint, the United States alleges, *inter alia*, that
13 CalPortland failed to obtain the necessary PSD permits and install the necessary
14 controls under the Act to reduce nitrogen oxides ("$NO_x$"), sulfur dioxide ("$SO_2$") and
15 carbon monoxide ("CO"), and that CalPortland failed to obtain an operating permit
16 under Title V of the Act and Title V's implementing federal and California
17 regulations that reflects applicable requirements imposed under the PSD
18 requirements of the Act and the California applicable implementation plan;

19     WHEREAS, the Complaint alleges claims upon which relief can be granted
20 against CalPortland under Sections 113 and 167 of the Act, 42 U.S.C. §§ 7413 and
21 7477;

22     WHEREAS, EPA issued Notices of Violation and Findings of Violation
23 ("NOVs") to CalPortland pursuant to Section 113(a)(1) and (a)(3) of the Act, 42
24 U.S.C. § 7413(a)(1) and (a)(3), on August 19, 2008 and March 10, 2010 for, *inter*
25 *alia*, violations of the PSD provisions of the Act and the PSD regulations
26 incorporated into the California applicable implementation plan, and EPA provided
27 a copy of the NOVs to the Kern County Air Pollution Control District ("District")
28 and the State of California;

1   WHEREAS, CalPortland, the State of California, and the District have actual
2  notice of the violations alleged against CalPortland in the Complaint filed in this
3  case, and CalPortland stipulates that it has received actual notice of the violations
4  alleged in the Complaint and that it does not contest the adequacy of the notice
5  provided;

6   WHEREAS, the United States provided notice of the commencement of this
7  action to the State of California and the District pursuant to Section 113(b) of the
8  Act, 42 U.S.C. § 7413(b);

9   WHEREAS, the United States and CalPortland ("the Parties") have agreed
10  that settlement of this action is in the best interest of the Parties and in the public
11  interest, have agreed on the appropriateness of various measures intended to resolve
12  the alleged violations and have further agreed that entry of this Consent Decree
13  without litigation is the most appropriate means of resolving this matter;

14   WHEREAS, the Parties recognize, and the Court, by entering this Consent
15  Decree finds, that this Consent Decree has been negotiated by the Parties in good
16  faith and will avoid litigation between the Parties and that this Consent Decree is
17  fair, reasonable, and in the public interest;

18   NOW, THEREFORE, before trial and without the final adjudication, or
19  admission, of any issue of fact or law except as provided in Section I (Jurisdiction
20  and Venue), below, and with the consent of the Parties, IT IS HEREBY
21  ADJUDGED, ORDERED, AND DECREED as follows:

22   ## I. **JURISDICTION AND VENUE**

23   1.   This Court has jurisdiction of the subject matter herein pursuant to
24  Sections 113(b) and 167 of the Act, 42 U.S.C. §§ 7413(b) and 7477, and pursuant to
25  28 U.S.C. §§ 1331, 1345, 1355, and 1367(a), and over the Parties. Venue is proper
26  in this judicial district pursuant to Sections 113(b) and 304(c) of the Act, 42 U.S.C.
27  §§ 7413(b) and 7604(c), and under 28 U.S.C. §§ 1391(b) and (c) and 1395(a). For
28  purposes of this Consent Decree, or any action to enforce this Decree, CalPortland

1  consents to the Court's jurisdiction over this Decree and any such action and over
2  CalPortland and consents to venue in this judicial district.

## II. APPLICABILITY

4      2.      The obligations of this Consent Decree apply to and are binding upon
5  the United States and CalPortland and any successors, assigns, or other entities or
6  persons otherwise bound by law.

7      3.      No transfer of ownership or operation of the Facility, whether in
8  compliance with the procedures of this Paragraph or otherwise, shall relieve
9  Defendant of its obligation to ensure that the terms of the Decree are implemented,
10  unless (1) the transferee agrees to undertake the obligations required by Sections V
11  (Compliance Requirements), VI (Prohibition on Netting Credits or Offsets), VII
12  (Permits), VIII (Review and Approval of Submittals), IX (Reporting Requirements),
13  X (Stipulated Penalties), XI (Force Majeure), XII (Dispute Resolution), and XIII
14  (Information Collection and Retention) of this Consent Decree and to be substituted
15  for the Defendant as a Party under the Consent Decree and, thus, be bound by the
16  terms thereof, and (2) the United States consents to relieve Defendant of its
17  obligations. The United States' approval or disapproval of the substitution of the
18  transferee for the Defendant shall not be subject to judicial review. At least 30 Days
19  prior to such transfer, Defendant shall provide a copy of this Consent Decree to the
20  proposed transferee and shall simultaneously provide written notice of the
21  prospective transfer, together with a copy of the proposed written agreement, to
22  EPA Region 9, the United States Attorney for the Eastern District of California, and
23  the United States Department of Justice, in accordance with Section XVI of this
24  Decree (Notices). Any attempt to transfer ownership or operation of the Facility
25  without complying with this Paragraph constitutes a violation of this Decree.

26      4.      CalPortland shall provide a copy of this Consent Decree to all officers,
27  employees, and agents whose duties might reasonably include compliance with any
28  provision of this Consent Decree, as well as to any Contractor retained to perform

1  work required under this Consent Decree.  CalPortland shall condition any such
2  contract upon performance of the work in conformity with the terms of this Consent
3  Decree.

4      5.      In any action to enforce this Consent Decree, CalPortland shall not
5  raise as a defense the failure by any of its officers, directors, employees, agents, or
6  Contractors to take any actions necessary to comply with the provisions of this
7  Consent Decree.

## III. DEFINITIONS

9      6.      Terms used in this Consent Decree that are defined in the Act or in
10  regulations promulgated pursuant to the Act shall have the meanings assigned to
11  them in the Act or such regulations, unless otherwise provided in this Consent
12  Decree.  Whenever the terms set forth below are used in this Consent Decree, the
13  following definitions shall apply:

14      (a)    "30-Day Rolling Average Emission Rate" shall mean the rate of
15  emission of a specified air pollutant ($NO_x$ or $SO_2$) expressed as pounds (lb) per Ton
16  of clinker produced ("lb $NO_x$/Ton of clinker" or "lb $SO_2$/Ton of clinker") at the Kiln
17  and calculated in accordance with the following procedure:  first, sum the total
18  pounds of the pollutant in question emitted from the Kiln during an Operating Day
19  and the previous 29 Operating Days, as measured pursuant to Section V.C.
20  (Continuous Emission Monitoring Systems) ("30 Day Rolling Period"); second, sum
21  the total Tons of clinker produced by the Kiln during the same Operating Day and
22  the previous 29 Operating Days; and third, divide the total number of pounds of the
23  specified pollutant emitted from the Kiln during the 30 Operating Days referred to
24  above by the total Tons of clinker produced at the Kiln during the same 30
25  Operating Days.  A new 30-Day Rolling Average Emission Rate shall be calculated
26  for each new Operating Day.  Each 30-Day Rolling Average Emission Rate shall
27  include all emissions of the relevant pollutant from the Kiln during all periods of
28  Kiln Operation on any Operating Day, including emissions during each Startup,

Shutdown, or Malfunction.  If CalPortland asserts that a Malfunction and any resulting Kiln Shutdown and Startup is a Force Majeure event within the meaning of Section XI (Force Majeure), CalPortland shall include all such emissions in the calculation of the 30-Day Rolling Average Emission Rate, but shall not be subject to stipulated penalties for a violation of an applicable emission limitation pursuant to Section X (Stipulated Penalties) to the extent that emissions associated with the particular Malfunction and any resulting Kiln Shutdown and Startup cause an emission violation and the Malfunction and any resulting Kiln Shutdown and Startup is determined to be a Force Majeure event under Section XI (Force Majeure) and CalPortland has complied with the requirements of that Section.

    (b)    "Business Day" means any day, except for Saturday, Sunday and federal holidays.

    (c)    "CalPortland" shall mean the CalPortland Company.

    (d)    "CEMS" or "Continuous Emission Monitoring System" shall mean, for obligations involving $NO_x$, $SO_2$ or CO under this Consent Decree, the total equipment and software required to sample, to analyze, and to provide a record of $NO_x$, $SO_2$ and CO emissions rates, and the raw data necessary to support the reported emissions rates.  CEMS also includes a "CERMS", or "Continuous Emission Rate Monitoring System," which means the total equipment and software necessary to measure flow rate as a component of calculating $NO_x$, $SO_2$ and CO emissions rates and 30-Day Rolling Average Emission Rates.  All CEMS shall be installed, calibrated, maintained, and operated in accordance with 40 C.F.R. § 60.13 and 40 C.F.R. Part 60 Appendix B and Appendix F.

    (e)    "CO" shall mean carbon monoxide, measured in accordance with the provisions of this Consent Decree.

    (f)    "Commence" or "Commencement" of operation of a pollution Control Technology shall mean to take such actions as are necessary to begin

1 operating that control technology, including (where applicable) the introduction of
2 any reagent employed by the pollution control technology.

3        (g)     "Complaint" shall mean the complaint filed by the United States
4 in this action.

5        (h)     "Consent Decree" or "Decree" shall mean this Decree and
6 Exhibit A attached.

7        (i)     "Continuously Operate" or "Continuous Operation" shall mean
8 that the Control Technology installed pursuant to this Consent Decree shall be
9 operated, including with reagent injection or introduction (where applicable), at all
10 times of Kiln Operation consistent with the technological limitations (including but
11 not limited to exhaust temperatures), manufacturers' specifications, and good
12 engineering and maintenance practices for such pollution control technology and the
13 Kiln, and good air pollution control practices consistent with 40 C.F.R. § 60.11(d).

14        (j)     "Contractor" shall mean any person or entity hired or contracted
15 by either Party to perform services necessary to comply with the provisions of this
16 Consent Decree.

17        (k)     "Control Technology" shall mean SNCR and/or LIS, or any
18 alternative pollution control technology approved by EPA pursuant to Paragraph 24.

19        (l)     "Date of Lodging" shall mean the date the Consent Decree is
20 filed for lodging with the Clerk of the Court for the United States District Court for
21 the Eastern District of California.

22        (m)     "Day" shall mean a calendar day unless expressly stated to be a
23 Business Day.  In computing any period of time under this Consent Decree, where
24 the last day would fall on a Saturday, Sunday, or federal holiday, the period shall
25 run until the close of business of the next Business Day.

26        (n)     "Demonstration Period Facility 6-Month Rolling Average
27 Emission Limit" shall mean, with respect to the Kiln at the Facility, the maximum
28 allowable rate of emission of a specified air pollutant ($NO_x$ or $SO_2$) from the Kiln

1 │ applicable during the Demonstration Period and until a 30-Day Rolling Average
2 │ Emission Limit is established under Exhibit A of the Consent Decree, and shall be
3 │ expressed as pounds of such air pollutant emitted per Ton of clinker produced.
4 │ Compliance with the Demonstration Period Facility 6-Month Rolling Average
5 │ Emission Limit shall be determined in accordance with the following procedure:
6 │ first, sum the total pounds of the air pollutant in question emitted from the Kiln
7 │ during the most recent complete month and the previous five (5) months, as
8 │ measured pursuant to Section V.C. (Continuous Emission Monitoring Systems);
9 │ second, sum the total Tons of clinker produced by the Kiln during the most recent·
10 │ complete month and the previous five (5) months; and, third, divide the total number
11 │ of pounds of the air pollutant emitted from the Kiln during the six (6) months by the
12 │ total Tons of clinker produced by the Kiln during the 6 months. A new compliance
13 │ determination of the Demonstration Period Facility 6-Month Rolling Average
14 │ Emission Limit shall be calculated for each new complete month in accordance with
15 │ the provisions of this Consent Decree. In calculating each compliance
16 │ determination of the Demonstration Period Facility 6-Month Rolling Average
17 │ Emission Limit for a specified air pollutant at the Facility, the total pounds of such
18 │ air pollutant emitted from the Kiln during the 6-month period shall include all
19 │ emissions of the air pollutant during each Startup, Shutdown or Malfunction that
20 │ occurs during the 6-month period at issue.

21 │         (o)      "Eastern Kern County Air Pollution Control District" or the
22 │ "District" shall mean the agency that is acting as the California authority
23 │ implementing CAA requirements relating to stationary sources in Kern County,
24 │ where the Facility is located, pursuant to Division 26 of the California Health &
25 │ Safety Code.

26 │         (p)      "Effective Date" shall have the meaning given in Section XVII
27 │ (Effective Date).

28 │

(q) "Emission Limits" or "30-Day Rolling Average Emission Limits" shall mean the final emission limits applicable to the Kiln for $NO_x$, $SO_2$ and CO, as established pursuant to Section V.B. (Emission Limits) and Exhibit A.

(r) "EPA" shall mean the United States Environmental Protection Agency and any of its successor departments or agencies.

(s) "Facility" shall mean the CalPortland portland cement manufacturing plant located in Kern County, California, with an address in its Clean Air Act Title V permit of 9350 Oak Creek Road, Mojave, California.

(t) "Kiln" as used in this Consent Decree shall have the same meaning as defined at 40 C.F.R. § 63.1341 and shall mean the single cement preheater/precalciner kiln at the Facility.

(u) "Kiln Operation" shall mean, with respect to the Kiln, any period when any raw materials are fed into the Kiln or any period when any combustion is occurring or fuel is being fired in the Kiln.

(v) "Lime Injection System" or "LIS" shall mean a pollution control system that injects hydrated lime into the gas stream at the preheater/precalciner tower for the purpose of reducing $SO_2$ emissions from the Main Stack.

(w) "Main Stack of the Kiln" or "Main Stack" means the exhaust stack of the Kiln that vents gases from the kiln preheater/precalciner tower to the atmosphere.

(x) "Malfunction" as used in this Consent Decree shall have the same meaning as defined at 40 C.F.R. § 60.2.

(y) "$NO_x$" shall mean oxides of nitrogen, measured in accordance with the provisions of this Consent Decree and expressed as nitrogen dioxide ("$NO_2$").

(z) "Operating Day" shall mean any Day on which Kiln Operation has occurred.

1          (aa)     "Optimized SNCR" shall mean the SNCR after performance of
2  the Kiln and the SNCR are optimized for $NO_x$ emission reductions pursuant to the
3  requirements of Paragraph 9 and Exhibit A, and after CalPortland has submitted and
4  EPA has reviewed and approved the Optimization Report.

5          (bb)     "Optimized LIS" shall mean the LIS after performance of the
6  Kiln and the LIS are optimized for $SO_2$ emission reductions pursuant to the
7  requirements of Paragraph 9 and Exhibit A, and after CalPortland has submitted and
8  EPA has reviewed and approved, the Optimization Report.

9          (cc)     "Paragraph" shall mean a portion of this Decree identified by an
10  Arabic numeral.

11          (dd)     "Parties" shall mean the United States and CalPortland.

12          (ee)     "PSD" shall mean the Prevention of Significant Deterioration
13  program within the meaning of Part C of Subchapter I of the Clean Air Act, 42
14  U.S.C. §§ 7470-7492, 40 C.F.R. Part 52, and the California Applicable
15  Implementation Plan.

16          (ff)     "Section" shall mean a portion of this Decree identified by a
17  roman numeral.

18          (gg)     "Selective Non-Catalytic Reduction" or "SNCR" shall mean a
19  pollution control system that injects a reagent into the gas stream without the use of
20  a catalyst for the purpose of reducing $NO_x$ emissions.

21          (hh)     "Shutdown" shall mean the cessation of Kiln Operation.

22          (ii)     "Startup" shall mean the beginning of Kiln Operation.

23          ·(jj)     "State" shall mean the State of California.

24          (kk)     "$SO_2$" shall mean sulfur dioxide, measured in accordance with
25  the provisions of this Consent Decree.

26          (ll)     "Title V permit" shall mean a permit required by or issued
27  pursuant to the requirements of 42 U.S.C. §§ 7661-7661f.

28          (mm) "Ton" or "Tons" shall mean short ton or short tons.

1         (nn)   "United States" shall mean the United States of America, acting
2 on behalf of EPA.

3 

### IV. CIVIL PENALTIES

4      7.     Within 30 Days after the Effective Date of this Consent Decree,
5 CalPortland shall pay the sum of $1,425,000 as a civil penalty to the United States.
6 If payment is not made within thirty (30) days of this Consent Decree's Effective
7 Date, in addition to the civil penalty, CalPortland shall pay interest accruing as of
8 the Lodging Date of the Consent Decree through the date of payment at the rate
9 specified in 28 U.S.C. § 1961 as of the Lodging Date. Such civil penalty shall be
10 paid by FedWire Electronic Funds Transfer ("EFT") to the U.S. Department of
11 Justice in accordance with written instructions to be provided to CalPortland,
12 following lodging of the Consent Decree, by the Financial Litigation Unit of the
13 U.S. Attorney's Office for the Eastern District of California, Federal Building, 501 I
14 Street, Suite 10-100, Sacramento, California, 95814. At the time of payment,
15 CalPortland shall send a copy of the EFT authorization form and the EFT
16 transaction record, together with a transmittal letter, which shall state that the
17 payment is for the civil penalties owed pursuant to the Consent Decree in United
18 States v. CalPortland Company, and shall reference the civil action number and DOJ
19 case number 90-5-2-1-08306/2, to the United States in accordance with Section XVI
20 (Notices) of this Consent Decree; by email to acctsreceivable.CINWD@epa.gov;
21 and to:

22               U.S. EPA Cincinnati Finance Office
              26 Martin Luther King Drive
23               Cincinnati, Ohio 45268

24

25      8.     CalPortland shall not deduct any penalties paid under this Decree
26 pursuant to this Section or Section X (Stipulated Penalties) in calculating its federal,
27 state, or local income taxes.

28

CONSENT DECREE -10-

# V.  **COMPLIANCE REQUIREMENTS**

## A.  **Control Technologies**

9.  CalPortland shall install and operate Optimized SNCR and LIS Control Technologies to reduce $NO_x$ and $SO_2$ emissions in accordance with the terms of Exhibit A.

10.  Upon commencement of the use of an SNCR system during the Optimization Period set forth in Exhibit A, CalPortland shall Continuously Operate SNCR at the Kiln at all times of Kiln Operation, unless an alternative Control Technology has been approved by EPA pursuant to Paragraph 24 to replace the SNCR system.  Should an alternative Control Technology be approved by EPA for the purpose of meeting the $NO_x$ Emission Limit, CalPortland shall Continuously Operate it at all times of Kiln Operation instead of the SNCR system.

11.  Upon commencement of LIS injection during the Optimization Period set forth in Exhibit A, CalPortland shall Continuously Operate LIS at the Kiln at all times of Kiln Operation, unless an alternative pollution Control Technology has been approved by EPA pursuant to Paragraph 24 to replace the LIS.  Should an alternative Control Technology be approved by EPA for the purpose of meeting the $SO_2$ Emission Limit, CalPortland shall Continuously Operate it at all times of Kiln Operation instead of the LIS.

12.  At all times, including periods of Startup, Shutdown, and Malfunction, CalPortland shall maintain and operate the Kiln, including all associated air pollution control equipment, in a manner consistent with good air pollution control practice consistent with 40 C.F.R. § 60.11(d).

13.  CalPortland shall comply with the deadlines and meet the interim Demonstration Period Facility 6-Month Rolling Average Emission Limits during the Demonstration Period specified below:

1

**TABLE 1**

| Control Technology | Deadline to Install and Commence Continuous Operation of Control Technologies | 6-Month Rolling Average Emission Limit (lbs/Ton of clinker) To Be Met During the Demonstration Period |
|---|---|---|
| SNCR | 360 Days after this Consent Decree's Effective Date, plus any Days added pursuant to Paragraph 14 | 2.50 lb $NO_x$/ Ton of clinker |
| LIS | 360 Days after  this Consent Decree's Effective Date, plus any Days added pursuant to Paragraph 14 | 1.7 lb $SO_2$/ Ton of clinker |

14.     If EPA's action taken pursuant to the Section VIII (Review and Approval) provisions of this Consent Decree is more than 45 Days after EPA's receipt of the Design Report specified in Paragraph 5 of Exhibit A, the applicable Deadline to Install and Commence Continuous Operation of Control Technologies, specified in Paragraph 13 above, shall be extended by the same number of Days that EPA's action exceeds the 45-Day period.

**B.     Emission Limits**

15.     CalPortland shall:

(a)     comply with Exhibit A in establishing 30-Day Rolling Average Emission Limits for $NO_x$ and $SO_2$ applicable to the Kiln;

(b)     within 30 Days after establishment of the final $NO_x$ and $SO_2$ Emission Limits approved by EPA pursuant to Paragraph 25 of Exhibit A, achieve and maintain the Emission Limit(s), and be subject to stipulated penalties for any exceedance of those Emission Limit(s) pursuant to Section X (Stipulated Penalties); and

1                (c)      achieve and maintain compliance with a 30-day Rolling Average

2 Emission Limit of 1.0 lb CO/Ton of clinker effective upon the date of submission of

3 the Demonstration Report required by Exhibit A subject to the provisions of sub-

4 paragraphs (i)-(iii) below:

5                                   (i)      Prior to or in conjunction with the submission of the

6 Demonstration Report required by Exhibit A, CalPortland may

7 request in writing from EPA a 30-day Rolling Average Limit for

8 CO emissions different than 1.0 lb CO/Ton of Clinker.  In that

9 request, CalPortland shall identify its proposed alternative CO

10 emission limit, describe the technical basis for the proposed

11 limit, and present sufficient data to support the proposed limit.

12 In establishing the emission limit, CalPortland shall use the

13 formula described in Paragraph 23 of Exhibit A.

14                                   (ii)     Upon the submission of a request for a CO alternative

15 limit pursuant to Subparagraph 15(c)(i) above, the date for

16 achieving and maintaining compliance with a CO emission limit

17 shall be extended until such time as EPA takes final action on

18 CalPortland's request.  Upon issuance of EPA's notice of final

19 action on CalPortland's request, consistent with the Section VIII

20 (Review and Approval) provisions of this Consent Decree,

21 CalPortland shall immediately achieve and maintain compliance

22 with a CO emission limit of: (1) 1.0 lb CO/Ton of Clinker if

23 CalPortland's request was not approved; or, (2) the CO

24 alternative emission limit approved by EPA.

25                                   (iii)   Any CO emission limit established through a final PSD

26 permit required by any physical or operational changes set forth

27 in this Consent Decree shall become the CO emission limit for

28 purposes of this Consent Decree.  Upon the effective date of the

1                      PSD CO emission limit, any CO emission limits established

2                      pursuant to this Paragraph 15 shall be permanently superseded.

3                      Other than Subparagraphs 15(b) and 15(c)(i)-(ii) above, this

4                      provision modifies no other terms or conditions of this Consent

5                      Decree.

6       16.    During the Demonstration Period set forth in Exhibit A, CalPortland

7 shall: (a) meet the Demonstration Period Facility 6-Month Rolling Average

8 Emission Limits set forth in Paragraph 13; (b) comply with the requirements of

9 Exhibit A; and (c) operate the Kiln in a manner consistent with normal operation

10 and good pollution control practices consistent with 40 C.F.R. § 60.11(d).

11       17.    CalPortland may request in writing that EPA extend the Demonstration

12 Period(s) for $NO_x$ and/or $SO_2$ for a period longer than the 270 Operating Days set

13 forth in Exhibit A due to operation of the Kiln, SNCR or LIS systems, or the CEMS,

14 that is not typical of normal operations, including Malfunction, for such period of

15 time as is necessary to collect sufficient data during normal operations to set the

16 Emission Limits. CalPortland may also request in writing that EPA shorten the

17 Demonstration Period(s) for $NO_x$ and/or $SO_2$ to a period shorter than the 270

18 Operating Days set forth in Exhibit A by demonstrating that sufficient data has been

19 collected during such period of time to effectively establish the Emission Limits.

20 EPA may also direct in writing that CalPortland shorten or lengthen the

21 Demonstration Period(s) for $NO_x$ and/or $SO_2$ to a period shorter or longer than the

22 270 Operating Days set forth in Exhibit A, and shall provide the supporting

23 reason(s) for such direction in its directory notice for such action, and CalPortland

24 shall extend or shorten the Demonstration Period(s) as directed. Any such EPA

25 response(s) or notice(s) is/are subject to the Section XII (Dispute Resolution)

26 provisions of this Consent Decree.

27       18.    The Emission Limits for $NO_x$ and $SO_2$ submitted by CalPortland to

28 EPA as part of the Final Demonstration Report(s) pursuant to Section V (Control

1 Technology Demonstration Period) of Exhibit A shall constitute, and remain in
2 effect as, the Facility's interim emission limits until the Emission Limits are
3 finalized pursuant to Paragraph 25 of Exhibit A and Section XII (Dispute
4 Resolution).

5    19. The final Emission Limits for $NO_x$ and $SO_2$ submitted by CalPortland
6 to EPA as part of the Final Demonstration Report(s) pursuant to Section V (Control
7 Technology Demonstration Period) of Exhibit A shall not be greater than 2.5 lb of
8 $NO_x$/Ton of clinker and 1.7 lb of $SO_2$/Ton of clinker on 30-Day Rolling Averages.
9 For CO, the final Emission Limit is a 30-day Rolling Average Emission Limit of 1.0
10 lb CO/Ton of clinker effective upon the date of submission of the Demonstration
11 Report required by Exhibit A subject to Subparagraph 15(c)(i)-(iii) of this Consent
12 Decree.

13 **C.** **Continuous Emission Monitoring Systems**

14    20. Within 90 days of this Consent Decree's Effective Date, and continuing
15 thereafter, CalPortland shall install, certify and operate $NO_x$, $SO_2$ and CO CEMS at
16 the Kiln's Main Stack. The CEMS shall meet 40 C.F.R. Part 60, Appendix B
17 Performance Specifications 2, 4 and 6 requirements, and shall be calibrated and
18 maintained in accordance with 40 C.F.R. Part 60, Section 60.13 and Appendix F.

19    21. Except as otherwise provided in 40 C.F.R. Part 60, CalPortland shall
20 operate the CEMS at all times during Kiln Operation. The CEMS shall be used:
21 (a) in calculating the 30-Day Rolling Average Emission Rate for $NO_x$ and $SO_2$
22 established in V.B. (Emission Limits); and, (b) for purposes of the Optimization and
23 Demonstration Periods for $NO_x$ and $SO_2$ pursuant to Exhibit A. The CEMS data
24 shall be maintained in a data acquisition handling system.

25    22. For purposes of this Consent Decree, all $NO_x$, $SO_2$ and CO Emissions
26 Rates shall be measured by the CEMS. During any time when any of the CEMS are
27 inoperable or otherwise not measuring and recording valid emissions data,
28 CalPortland shall use the missing data substitution procedures in 40 C.F.R. Part 75,

1 Subpart D, and shall report CEMS downtime in accordance with 40 C.F.R.
2 § 60.7(c).

3 **D.** **Kiln Reagent Injection Monitoring System**

4     23.    Within 10 Days following the installation of the SNCR on the Kiln
5 Main Stack, and continuing thereafter, CalPortland shall install and operate at all
6 times during Kiln Operations a monitoring system to continuously measure the
7 reagent injection rate of the SNCR system. This monitoring system must be
8 installed, calibrated, operated, and maintained in accordance with the manufacturer's
9 recommendations. The injection rate shall be measured in volumetric flow and
10 converted to pounds per hour as 100% reagent. The amount of reagent shall be
11 recorded with the CEMS data in a data acquisition handling system. Should EPA
12 approve an alternative Control Technology for $NO_x$ emissions under Paragraph 24,
13 CalPortland shall install and operate a monitoring system for the alternative Control
14 Technology as specified in EPA's approval for purposes of meeting the
15 requirements of this Paragraph.

16 **E.** **Alternative Pollution Control Technologies**

17     24.    At any time prior to termination of this Consent Decree, CalPortland
18 may request EPA's approval to implement an alternative pollution control
19 technology for $NO_x$ or $SO_2$ other than what is required by this Consent Decree. In
20 seeking such approval, CalPortland must demonstrate to EPA that such alternative
21 pollution control technology will: (a) achieve and maintain the applicable Emission
22 Limit established pursuant to Exhibit A or, (b) meet the applicable limits established
23 by the New Source Performance Standard, 40 C.F.R. Part 60 Subpart F (NSPS
24 Emission Limits) for $NO_x$ and/or $SO_2$, if such limits are in effect and more stringent
25 than 2.5 lb of $NO_x$/Ton of clinker and 1.7 lb of $SO_2$/Ton of clinker on 30-Day
26 Rolling Averages. EPA's decision on a request is subject to the Section XII
27 (Dispute Resolution) provisions of this Consent Decree. CalPortland's request shall
28 address when the alternative pollution control(s) will be installed and operational,

1   and for the NSPS Emission Limit(s) in effect at the time, indicate when it will apply
2   to the Kiln. After any approval by EPA under this Paragraph of an alternative NSPS
3   Emission Limit, CalPortland shall continue to comply with all requirements of this
4   Consent Decree, including Exhibit A, until such time as CalPortland notifies the
5   EPA in writing that it is meeting the current NSPS Emission Limit(s) for $NO_x$ or
6   $SO_2$. As of that date, the NSPS Emission Limit(s) for $NO_x$ and/or $SO_2$ in effect at
7   that time shall become the Emission Limit(s) for all purposes under this Consent
8   Decree, and CalPortland would no longer be obligated to complete the test-and-set
9   process set forth in Exhibit A for the relevant pollutant.

10

11   ## VI. PROHIBITION ON NETTING CREDITS OR OFFSETS FROM
12   ## REQUIRED CONTROLS

13   25.    Emission reductions resulting from compliance with the requirements
14   of this Consent Decree shall not be considered as a creditable contemporaneous
15   emission decrease for the purpose of obtaining a netting credit or offset under the
16   Act's Nonattainment New Source Review or PSD programs.

17   26.    Nothing in this Consent Decree is intended to preclude the emission
18   reductions generated under this Decree from being considered by EPA, the
19   California Air Resources Board, or the District as creditable contemporaneous
20   emission decreases for the purpose of attainment demonstrations submitted pursuant
21   to Section 110 of the Act, 42 U.S.C. § 7410, or in determining impacts on National
22   Ambient Air Quality Standards, PSD increments, or air quality-related values,
23   including visibility in a Class I area.

24   ## VII. PERMITS

25   27.    Where any otherwise applicable law or this Consent Decree requires
26   CalPortland to obtain a federal, State or local permit or approval, including all local
27   land use approval, preconstruction, construction and operating permits, as well as
28   any approval, study, analysis or report required under the California Environmental

1   Quality Act (CEQA) review, CalPortland shall submit timely and complete
2   applications and take all other actions necessary to obtain all such permits or
3   approvals, allowing for all legally-required processing and review and requests for
4   additional information by the permitting or approval authority.  CalPortland may
5   seek relief under the provisions of Section XI (Force Majeure) of this Consent
6   Decree for any delay in the performance of any obligation under this Consent
7   Decree resulting from a failure to obtain, or a delay in obtaining, any permit or
8   approval required to fulfill such obligation, including if the delay is caused by a
9   required environmental impact review process such as CEQA, if CalPortland has
10  submitted timely and complete applications and has taken all other actions necessary
11  to obtain all such permits or approvals.

12        28.     Within 180 Days from EPA's notice to CalPortland pursuant to
13  Paragraph 25 of Exhibit A or a final decision pursuant to Section XII (Dispute
14  Resolution) of the Decree (whichever is latest), CalPortland shall apply to the
15  District to include the following requirements of this Consent Decree into a
16  federally enforceable permit (other than a Title V permit) issued under the
17  California state implementation plan ("SIP") (and independent of the authority to
18  issue Title V permits):  compliance with the final Emission Limits established or
19  determined pursuant to Paragraphs 22-25 of Exhibit A and Section V.B (Emission
20  Limits), operational requirements for the SNCR, LIS or any alternative pollution
21  control technology approved pursuant to Paragraph 24 of this Consent Decree
22  including but not limited to the requirements to Continuously Operate those Control
23  Technologies pursuant to Paragraphs 10 and 11 of this Consent Decree, the
24  monitoring requirements of this Decree, and the requirements in Section VI
25  pertaining to the Prohibition on Netting Credits or Offsets.  In lieu of incorporating
26  these terms of the Consent Decree directly into a federally enforceable permit,
27  CalPortland may request the State (either directly or through the District) to submit
28  the requirements of the Consent Decree to EPA for approval under the California

1 SIP in accordance with 42 U.S.C. § 7410(k), and its obligation under this Paragraph
2 shall be satisfied upon the issuance by the State of a final SIP revision, after
3 approval by EPA, incorporating the Consent Decree obligations identified above.
4 Following submission of the application for the permit or request for a SIP revision,
5 CalPortland shall cooperate with the District and/or the California Air Resources
6 Board ("CARB") by promptly submitting any additional information requested
7 following their receipt of the application for the permit and/or request for a SIP
8 revision.

9      29.   Within 60 Days of issuance of a permit by the appropriate permitting
10 authority, or in conjunction with the issuance of such permit, or upon issuance of a
11 final SIP revision, CalPortland shall file any applications necessary to incorporate
12 the requirements of the permit or SIP revision into the Title V operating permit for
13 the Facility.

14      30.   The Parties agree that incorporation of the requirements of this Consent
15 Decree into the Title V permit for the Facility shall be in accordance with the
16 applicable federal, State or local rules or laws.

17      31.   CalPortland shall provide EPA with a copy of each application for a
18 permit or request for SIP revision, as well as a copy of any permit or SIP revision
19 proposed as a result of such application or request, to allow for timely participation
20 in any public comment opportunity.

21      32.   Notwithstanding the reference to a Title V permit in this Consent
22 Decree, the enforcement of such a permit shall be in accordance with its own terms
23 and the Act. The Title V permit shall not be enforceable under this Consent Decree,
24 although any term or limit established by or under this Consent Decree shall be
25 enforceable under this Consent Decree regardless of whether such term has or will
26 become part of a Title V permit, subject to the terms of Section XX (Termination) of
27 this Consent Decree.

28

1

## VIII. REVIEW AND APPROVAL OF SUBMITTALS

2      33.    After review of any plan, report, or other document that is required to
3  be submitted pursuant to this Consent Decree, EPA shall in writing: (a) approve the
4  submission; (b) approve the submission upon specified conditions; (c) approve part
5  of the submission and disapprove (with explanation) the remainder; or,
6  (d) disapprove (with explanation) the submission.

7      34.    If the submission is approved pursuant to Paragraph 33(a), CalPortland
8  shall take all actions required by the plan, report, or other document, in accordance
9  with the schedules and requirements of the plan, report, or other document, as
10  approved, and/or this Consent Decree. If the submission is conditionally approved
11  or approved only in part, pursuant to Paragraph 33(b) or (c), CalPortland shall, upon
12  written direction of EPA, take all actions required by the approved plan, report, or
13  other item that EPA determines are technically severable from any disapproved
14  portions, subject to CalPortland's right to dispute only the specified conditions or the
15  disapproved portions under the Section XII (Dispute Resolution) provisions of this
16  Consent Decree.

17      35.    If the submission is disapproved in whole or in part pursuant to
18  Paragraph 33(c) or (d), CalPortland shall, subject to its right to dispute the
19  disapproved portions pursuant to the Section XII (Dispute Resolution) provisions of
20  this Consent Decree, within 30 Days or such other time as the Parties agree to in
21  writing, correct all deficiencies and resubmit the plan, report, or other item, or
22  disapproved portion thereof, for approval, in accordance with this Section VIII. If
23  the resubmission is approved in whole or in part, CalPortland shall proceed in
24  accordance with the preceding Paragraph.

25      36.    Any stipulated penalties applicable to an original submission that is
26  disapproved in whole or in part pursuant to Paragraph 33(c) or (d), as provided in
27  Section X (Stipulated Penalties) of this Decree, shall continue to accrue during the
28  30-Day period or other specified period, but shall not be payable unless the

1  resubmission is untimely or is disapproved in whole or in part; provided that, if the
2  original submission was so deficient as to constitute a material breach of
3  CalPortland's obligations under this Decree, the stipulated penalties applicable to the
4  original submission shall be due and payable notwithstanding any subsequent
5  resubmission.

6      37.    If a resubmitted plan, report, or other item, or portion thereof, is
7  disapproved in whole or in part, EPA may again require CalPortland to correct any
8  deficiencies in accordance with this Section VIII, or may correct any deficiencies
9  itself and seek stipulated penalties, subject to CalPortland's right to invoke the
10 Section XII (Dispute Resolution) provisions of this Consent Decree and the right of
11 EPA to seek stipulated penalties provided in the preceding Paragraphs.

12                    **IX. REPORTING REQUIREMENTS**

13     38.    Within 30 Days after the end of each half calendar year (i.e., by
14 January 30th and July 30th) after the Effective Date, until termination of this
15 Consent Decree pursuant to Section XX (Termination), CalPortland shall submit a
16 semi-annual report to EPA for the immediately preceding half calendar year period
17 that shall:

18          (a)    Identify any and all dates on which CalPortland commenced and
19 completed installation, and the status of the installation of any Control Device
20 required to be installed and operated at the Kiln under this Consent Decree, and
21 describe any problems encountered or anticipated during such installation, together
22 with implemented or proposed solutions;

23          (b)    Identify any and all dates on which CalPortland has completed
24 installation of, or describe the progress of installation of, each CEMS required under
25 Section V.C. (Continuous Emission Monitoring Systems), and describe any
26 problems encountered or anticipated during such installation, together with
27 implemented or proposed solutions;

28

1    (c)  Provide all CEMS and ammonia injection data collected for the
2 Kiln under Section V.C. (Continuous Emission Monitoring Systems);

3    (d)  Provide all data necessary to determine compliance with Section
4 V.B. (Emission Limits);

5    (e)  Identify all periods of excess emissions, in a format that satisfies
6 the requirements of 40 C.F.R. Part 60, Sections 60.7(c) and 60.13(h), that includes
7 the date, time of commencement and completion, magnitude, reason for each time
8 period of excess emission; the operating time of the Kiln; and all time periods of
9 Kiln, control equipment, and CEMS malfunctions;

10    (f)  Provide a complete description and status of all actions
11 CalPortland has undertaken to comply with Exhibit A to this Consent Decree;

12    (g)  Describe the status of permit applications required under this
13 Consent Decree; and

14    (h)  Describe the status of any operation and maintenance work
15 relating to activities required under this Consent Decree.

16  The semi-annual report shall also include a description of any non-
17 compliance with the requirements of this Consent Decree and an explanation of the
18 violation's likely cause and of the remedial steps taken (including the length of time
19 to comply or date when compliance will be achieved), or to be taken, to prevent or
20 minimize such violation.

21  39.  If CalPortland violates, or has reason to believe that it may have
22 violated, any requirement of this Consent Decree, CalPortland shall notify the
23 United States of such violation and its likely duration, in writing, within 10 Days of
24 the Day CalPortland first became aware of the violation, with an explanation of the
25 violation's likely cause and of the remedial steps taken, or to be taken, to prevent or
26 minimize such violation. CalPortland shall investigate the cause of the violation and
27 shall then submit an amendment to the notification required under this Paragraph,
28 including a full explanation of the cause of the violation, within 30 Days of the Day

1  CalPortland becomes aware of the cause of the violation. Nothing in this Paragraph
2  or the following Paragraph relieves CalPortland of its obligation to provide the
3  notice required by Section XI (Force Majeure) of this Consent Decree if CalPortland
4  contends a Force Majeure event occurred.

5       40.    Whenever any violation of this Consent Decree, or of any applicable
6  permits required under this Consent Decree, or any other event affecting
7  CalPortland's performance under this Decree, or the performance of the Facility,
8  may pose an immediate threat to the public health or welfare or the environment,
9  CalPortland shall notify EPA orally or by electronic or facsimile transmission as
10 soon as possible, but no later than 24 hours after CalPortland first knew, or
11 reasonably should have known, of the violation or event. This procedure is in
12 addition to the requirements set forth in the preceding Paragraph.

13      41.    All reports shall be submitted to the persons designated in Section XVI
14 (Notices) of this Consent Decree.

15      42.    Each report submitted by CalPortland under this Section shall be signed
16 by an official of the submitting party and include the following certification:

17          I certify under penalty of law that this document and all
18          attachments were prepared under my direction or
            supervision in accordance with a system designed to
19          assure that qualified personnel properly gather and
20          evaluate the information submitted. Based on my inquiry
            of the person or persons who manage the system, or those
21          persons directly responsible for gathering the information,
22          the information submitted is, to the best of my knowledge
            and belief, true, accurate, and complete. I am aware that
23          there are significant penalties for submitting false
24          information, including the possibility of fine and
            imprisonment for knowing violations.
25

26 This certification requirement does not apply to emergency or similar notifications
27 where compliance would be impractical.

28

1      43.    The reporting requirements of this Consent Decree do not relieve
2 CalPortland of any reporting obligations required by the Act or implementing
3 regulations, or by any other federal, State, or local law, regulation, permit, or other
4 requirement.

5      44.    Any information provided pursuant to this Consent Decree may be used
6 by the United States in any proceeding to enforce the provisions of this Consent
7 Decree and as otherwise permitted by law.

8 ## X. STIPULATED PENALTIES

9      45.    CalPortland shall be liable for stipulated penalties to the United States
10 for violations of this Consent Decree as specified in Table 2 below, unless excused
11 under Section XI (Force Majeure) or otherwise reduced or waived by EPA. A
12 violation includes failing to perform any obligation required by the terms of this
13 Decree, including any work plan or schedule approved under this Decree, according
14 to all applicable requirements of this Decree and within the specified time schedules
15 established by or approved under this Decree.

16 **TABLE 2**

| CONSENT DECREE VIOLATIONS | STIPULATED PENALTY |
|---|---|
| Failure to pay the civil penalty as specified in Section IV (Civil Penalty) of this Consent Decree | $5,000 for each Day |
| Failure to comply with any 30-Day Rolling Average Emission Rate limitation for $NO_x$ and $SO_2$, where the emissions are less than 5% in excess of the limits set forth in this Consent Decree | $1,500 for each Operating Day during any 30-Day Rolling Period |
| Failure to comply with any 30-Day Rolling Average Emission Rate limitation for $NO_x$ and $SO_2$ where the emissions are equal to or greater than 5% but less than 10% in excess of the limits set forth in this Consent Decree | $3,000 for each Operating Day during any 30-Day Rolling Period |
| Failure to comply with a 30-Day Rolling Average Emission Rate limitation for $NO_x$ and $SO_2$ where the emissions are equal to or greater than 10% in excess of the limits set forth in this Consent Decree | $5,000 for each Operating Day during any 30-Day Rolling Period |
| Failure to timely install or commence Continuous Operation or Continuously Operate SNCR or LIS, as required in | $5,000 for each Day during the first 20 Days, $10,000 for each Day for the next 40 Days, |

| CONSENT DECREE VIOLATIONS | STIPULATED PENALTY |
|---|---|
| Paragraphs 10 and 11 at the Kiln | and $30,000 for each Day thereafter |
| Failure to timely apply for any permit or permit amendment required by Section VII (Permits) | $1,000 for each Day for each such failure |
| Failure to install or operate a CEMS in conformance with the requirements of Section V.C. (Continuous Emission Monitoring Systems), as applicable | $1,000 for each Day for each such failure |
| Failure to install or operate a Kiln System Ammonia Injection Monitoring System in conformance with the requirements of Section V.D. (Kiln Reagent Injection Monitoring System) | $1,000 for each Day for each such failure |
| Failure to timely complete the Demonstration Period as required by Section V of Exhibit A | $1,000 for each Day during the first 20 Days, $2,500 for each Day for the next 40 Days, and $5,000 for each Day thereafter |
| Failure to timely submit, modify, or implement, as approved, any of the following reports required by Exhibit A: (1) The Design Report; (2) the Optimization Protocol; (3) the Optimization Report; or (4) the Demonstration Period Final Report | $1,000 for each Day during the first 20 Days, $2,500 for each Day for the next 40 Days, and $5,000 for each Day thereafter |
| Failure to timely submit, modify, or implement, as approved, any report, plan, study, analysis, protocol, or other submittal required by this Consent Decree other than those identified elsewhere in this table | $750 for each Day during the first 10 Days, $1,000 for each Day thereafter |
| Any other violation of this Consent Decree, including failure to optimize process parameters or Control Technology parameters by the deadlines set forth in the Consent Decree. | $1,000 for each Day for each violation |

46.     Stipulated penalties under this Section shall begin to accrue on the Day after performance is due or on the Day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases. Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

47.     Violations of any limit based on a 30-Day rolling average constitutes 30 Days of violation but where such a violation (for the same pollutant from the Kiln) recurs within periods less than 30 Days, CalPortland shall not be obligated to

1 | pay a daily stipulated penalty for any Day of the recurrence for which a stipulated
2 | penalty has already been paid.

3 |     48.    CalPortland shall pay any stipulated penalty within 30 Days of
4 | receiving the United States' demand.

5 |     49.    The United States may, in the unreviewable exercise of its discretion,
6 | reduce or waive stipulated penalties otherwise due the United States under this
7 | Consent Decree.

8 |     50.    Stipulated penalties shall continue to accrue, as provided in this
9 | Section, during any Dispute Resolution, but need not be paid until the following:

10 |     (a)    If the dispute is resolved by agreement or by a decision of the
11 | EPA that is not appealed to the Court, CalPortland shall pay accrued penalties
12 | determined to be owing, together with interest in accordance with Paragraph 53
13 | within 30 Days of the effective date of the agreement or the receipt of EPA's
14 | decision or order.

15 |     (b)    If the dispute is appealed to the Court and the United States
16 | prevails in whole or in part, CalPortland shall pay all accrued penalties determined
17 | by the Court to be owing, together with interest in accordance with Paragraph 53,
18 | within 60 Days of receiving the Court's decision or order, except as provided in
19 | Subparagraph (c), below;

20 |     (c)    If any Party appeals the District Court's decision, CalPortland
21 | shall pay all accrued penalties determined to be owing, together with interest in
22 | accordance with Paragraph 53, within 15 Days of receiving the final appellate court
23 | decision.

24 |     51.    CalPortland shall pay stipulated penalties owing to the United States in
25 | the manner set forth in, and with the confirmation notices required by, Paragraph 7,
26 | except that the transmittal letter shall state that the payment is for stipulated
27 | penalties and shall state for which violation(s) the penalties are being paid.

28 |

1       52.     CalPortland shall not deduct stipulated penalties paid under this Section
2 in calculating their federal or State or local income tax.

3       53.     If CalPortland fails to pay stipulated penalties according to the terms of
4 this Consent Decree, CalPortland shall be liable for interest on such penalties, as
5 provided for in 28 U.S.C. § 1961, accruing as of the date payment became due.
6 Nothing in this Paragraph shall be construed to limit the United States from securing
7 any remedy otherwise provided by law for CalPortland's failure to pay any
8 stipulated penalties.

9       54.     Subject to the provisions of Section XIV (Effect of
10 Settlement/Reservation of Rights) of this Consent Decree, the stipulated penalties
11 provided for in this Consent Decree shall be in addition to any other rights,
12 remedies, or sanctions available to the United States for CalPortland's violation of
13 this Consent Decree or applicable law. Where a violation of this Consent Decree is
14 also a violation of any applicable statute, regulation, or permit, CalPortland shall be
15 allowed a credit, for any stipulated penalties paid, against any statutory penalties
16 imposed by the United States or EPA for such violation.

17 ## XI. FORCE MAJEURE

18       55.     "Force Majeure," for purposes of this Consent Decree, is defined as any
19 event, including those events described in Paragraph 27, arising from causes beyond
20 the control of CalPortland, of any entity controlled by CalPortland, or of
21 CalPortland's Contractors, that delays or prevents the performance of any obligation
22 under this Decree despite CalPortland's best efforts to fulfill the obligation. The
23 requirement that CalPortland exercise "best efforts to fulfill the obligation" includes
24 using best efforts to anticipate any potential Force Majeure event and best efforts to
25 address the effects of any such event (a) as it is occurring, and (b) after it has
26 occurred to prevent or minimize any resulting delay and any adverse environmental
27 effects of the delay, to the greatest extent possible. "Force Majeure" does not
28

1  include CalPortland's financial inability to perform any obligation under this
2  Consent Decree.

3      56.    If any event occurs or has occurred that may delay or prevent the
4  performance of any obligation under this Consent Decree, whether or not caused by
5  a Force Majeure event, CalPortland shall provide notice orally or by electronic or
6  facsimile transmission to the persons required to receive notice pursuant to Section
7  XVI (Notices) for EPA, within 96 hours of when CalPortland first knew that the
8  event might cause a delay. Within 10 Business Days thereafter, CalPortland shall
9  provide in writing to EPA an explanation and description of: the reasons for the
10 delay; the anticipated duration of the delay and any adverse environmental effects of
11 the delay; all actions taken or to be taken to prevent or minimize the delay; a
12 schedule for implementation of any measures to be taken to prevent or mitigate the
13 delay or the effects of the delay including measures to address any adverse
14 environmental effects; CalPortland's rationale for attributing such delay to a Force
15 Majeure event if it intends to assert such a claim; and a statement as to whether, in
16 CalPortland's opinion, such event may cause or contribute to an endangerment of
17 public health, welfare or the environment. CalPortland shall include with any
18 written notice all available documentation supporting the claim that the delay was
19 attributable to a Force Majeure. Failure to comply with the above requirements
20 shall preclude CalPortland from asserting any claim of Force Majeure for that event
21 for the period of time of such failure to comply, and for any additional delay caused
22 by such failure. CalPortland shall be deemed to know of any circumstance of which
23 CalPortland, any entity controlled by CalPortland, or a CalPortland's Contractor(s)
24 knew or reasonably should have known.

25     57.    If EPA agrees that the delay or anticipated delay is attributable to a
26 Force Majeure event, the time for performance of the obligations under this Consent
27 Decree that are affected by the Force Majeure event will be extended by EPA for
28 such time as is necessary to complete those obligations. An extension of the time

1  for performance of the obligations affected by the Force Majeure event shall not, of
2  itself, extend the time for performance of any other obligation. EPA will notify
3  CalPortland in writing of the length of the extension, if any, for performance of the
4  obligations affected by the Force Majeure event.

5      58.    If EPA does not agree that the delay or anticipated delay has been or
6  will be caused by a Force Majeure event, EPA will notify CalPortland in writing of
7  its decision.

8      59.    If CalPortland elects to invoke the procedures set forth in the Section
9  XII (Dispute Resolution) provisions of this Consent Decree, it shall do so no later
10 than 15 Days after receipt of EPA's written notice. In any such proceeding,
11 CalPortland shall have the burden of demonstrating by a preponderance of the
12 evidence that the delay or anticipated delay has been or will be caused by a Force
13 Majeure event, that the duration of the delay or the extension sought was or will be
14 warranted under the circumstances, that best efforts were exercised to avoid and
15 mitigate the effects of the delay, and that CalPortland complied with the
16 requirements of Paragraphs 55 and 56, above. If CalPortland carries this burden, the
17 delay at issue shall be deemed not to be a violation by CalPortland of the affected
18 obligation of this Consent Decree identified to EPA and the Court.

19 ## XII. DISPUTE RESOLUTION

20     60.    Unless otherwise expressly provided for in this Consent Decree, the
21 dispute resolution procedures of this Section shall be the exclusive mechanism to
22 resolve disputes arising under or with respect to this Consent Decree. CalPortland's
23 failure to seek resolution of a dispute under this Section shall preclude CalPortland
24 from raising any such issue as a defense to an action by the United States to enforce
25 any obligation of CalPortland arising under this Decree.

26     61.    Informal Dispute Resolution for Emission Limit Setting Process. If
27 CalPortland invokes Dispute Resolution regarding an EPA established final
28 alternative 30-Day Rolling Average Emission Limit, CalPortland shall initiate the

1 process set forth in this Paragraph to hire a contractor ("Contractor") who will be
2 tasked to analyze the Emission Limits established by EPA and proposed by
3 CalPortland and to provide, for the benefit of both EPA and CalPortland, the reports,
4 analysis, and services identified in this Paragraph, below, by the specified deadlines.
5 CalPortland shall bear all costs associated with the Contractor's work up to
6 $75,000, and shall provide the Contractor access to records, employees, contracts,
7 and facilities which are reasonably necessary to complete the report required by this
8 Paragraph. If costs to perform the work set forth in the Statement of Work ("SOW")
9 requirements described in Paragraph 61(b) are expected to be higher than $75,000,
10 CalPortland and EPA will, upon written mutual agreement, limit or modify the
11 nature and/or scope of the work to be performed under Paragraph 61(b) to meet the
12 expenditure limitation. For purposes of this Paragraph, "Contractor" shall mean a
13 qualified professional expert in the operation of, and emissions from, portland
14 cement kilns, including preheater/precalciner kilns, and experience related to the
15 review and analysis of emissions data collected by continuous emissions monitoring
16 systems ("CEMS") for compliance with regulatory emissions requirements, and who
17 has not previously been employed or retained by CalPortland in any capacity (unless
18 otherwise approved by EPA). This shall not prohibit individuals who have
19 performed work for the Portland Cement Association ("PCA") of which CalPortland
20 is a member.

21       (a)      CalPortland shall submit to EPA for approval, the name and
22 qualifications of a proposed Contractor for this engagement at the time it submits its
23 Written Notice of Dispute pursuant to Paragraph 25 of Exhibit A and in accordance
24 with Section XVI (Notices). If EPA disapproves of the Contractor, CalPortland is
25 required to propose to EPA within 15 days of the disapproval a different Contractor,
26 also subject to EPA's approval. If EPA disapproves the second Contractor, EPA
27 may choose and identify to CalPortland the Contractor to be employed. Any
28 contractor identified and chosen by EPA must be a qualified professional expert in

1  the operation of, and emissions from, portland cement kilns, including
2  preheater/precalciner kilns, and experience related to the review and analysis of
3  emissions data collected by CEMS for compliance with regulatory emissions
4  requirements and who has not previously been retained by EPA in any capacity
5  (unless otherwise approved by CalPortland). CalPortland shall have the right to
6  dispute EPA's Contractor selection under these Section XII (Dispute Resolution)
7  provisions of this Consent Decree. CalPortland shall enter into a contract with the
8  Contractor, containing the SOW requirements in Paragraph 61(b), below (as
9  modified to meet the expenditure limitations), within 7 days of EPA's approval or
10  final identification of the Contractor.

11      (b)     As part of the contract, CalPortland shall provide to the
12  Contractor a Statement of Work (SOW) which will include a requirement or
13  direction to:

14          (i)     Analyze the baseline data, if available, as well as the
15          Demonstration Report, proposed Emission Limits, data collected
16          during the demonstration period and any other relevant data from
17          the Facility;

18          (ii)    Submit to EPA and CalPortland, a report ("Contractor
19          Report" or "Report") on the appropriate 30-day rolling emission
20          limit, consistent with the methodology set forth in and
21          information collected through Exhibit A, based upon the
22          injection rates and the operational parameters approved as part of
23          the Optimization Report required by Paragraph 13 of Exhibit A.
24          The conclusions of this Report shall be based on all of the
25          information and data collected during the baseline, Optimization
26          and Demonstration Periods, as well as any additional site-
27          specific information available to the Contractor. The Report will
28          include a section on whether the data collected during the

1 | Demonstration Period is representative of normal operations of
2 | the unit, as well as a recommended final Emission Limit using
3 | the protocol and procedures in Exhibit A;
4 |     (iii)   Make available to EPA and CalPortland any and all data
5 | evaluated, and reveal all communications with CalPortland and
6 | EPA in the course of work pursuant to the SOW.  The Contractor
7 | shall also be tasked in the SOW to attend up to 40 hours of
8 | meetings specifically requested by EPA, to answer questions
9 | concerning any analysis or work undertaken pursuant to the
10 | SOW.  CalPortland shall have the right to reasonable notice for,
11 | and to attend, any such meeting between EPA and the
12 | Contractor.  The SOW will make clear that the Contractor is free
13 | to discuss its analysis, findings and the content of its Report with
14 | EPA prior to the completion of the Report, provided CalPortland
15 | has the opportunity to attend and participate in any such
16 | discussions; and
17 |     (iv)   Complete and deliver to EPA and CalPortland the
18 | Contractor Report within 45 days from the time of the effective
19 | date of the contract.

20     (c)   The results of the Contractor Report will inform the parties in the

21 process of engaging in informal dispute resolution on the proposed and final permit

22 limit.

23     (d)   If the parties are unable to reach agreement on a final 30-Day

24 Rolling Average Emission Limit within 20 days after receipt of the Contractor

25 Report by EPA, CalPortland  may request formal dispute resolution under Paragraph

26 63 of this Consent Decree.  The Contractor Report shall be part of the Dispute

27 Resolution record in any formal dispute proceedings under this Consent Decree.

28

1      62.    Informal Dispute Resolution with Respect to Other Disputes.  Any
2  dispute subject to dispute resolution under this Consent Decree shall first be the
3  subject of informal negotiations.  The dispute shall be considered to have arisen
4  when CalPortland sends the United States a written Notice of Dispute.  Such Notice
5  of Dispute shall state clearly the matter in dispute.  The period of informal
6  negotiations shall not exceed 20 Days from the date the dispute arises, unless that
7  period is modified by written agreement.  If the Parties cannot resolve a dispute
8  under this Paragraph or Paragraph 61 by informal negotiations, then the position
9  advanced by the United States shall be considered binding unless, within 20 Days
10  after the conclusion of the informal negotiation period, CalPortland invokes formal
11  dispute resolution procedures as set forth below.

12      63.    Formal Dispute Resolution.  CalPortland shall invoke formal dispute
13  resolution procedures, within the time period provided in Paragraph 61 or 62 (as
14  applicable), by serving on the United States a written Statement of Position
15  regarding the matter in dispute.  The Statement of Position shall include, but may
16  not necessarily be limited to, any factual data, analysis, or opinion supporting
17  CalPortland's position and any supporting documentation relied upon by
18  CalPortland.

19      64.    The United States shall serve its Statement of Position within 45 Days
20  of receipt of CalPortland's Statement of Position.  The United States' Statement of
21  Position shall include, but may not be limited to, any factual data, analysis, or
22  opinion supporting that position and any supporting documentation relied upon by
23  the United States.  The Statement of Position of the United States shall be binding
24  on CalPortland, unless CalPortland files a motion for judicial review of the dispute
25  in accordance with the following Paragraph.

26      65.    CalPortland may seek judicial review of the dispute by filing with the
27  Court and serving on the United States, in accordance with Section XVI (Notices) of
28  this Consent Decree, a motion requesting judicial resolution of the dispute.  The

1  motion must be filed within 15 Days of receipt of the United States' Statement of
2  Position pursuant to the preceding Paragraph. The motion shall contain a written
3  statement of CalPortland's position on the matter in dispute, including any
4  supporting factual data, analysis, opinion, or documentation, and shall set forth the
5  relief requested and any schedule within which the dispute must be resolved for
6  orderly implementation of the Consent Decree.

7  66.    The United States shall respond to CalPortland's motion within the time
8  period allowed by the Local Rules of this Court. CalPortland may file a reply
9  memorandum, to the extent permitted by the Local Rules.

10  67.    Standard of Review. Except as otherwise provided in this Consent
11  Decree, in any dispute brought under Paragraph 63 (Formal Dispute Resolution),
12  CalPortland shall bear the burden of demonstrating that its position complies with
13  this Consent Decree and that it is entitled to relief under applicable principles of
14  law. The United States reserves the right to argue that its position is reviewable
15  only on the administrative record and must be upheld unless arbitrary and capricious
16  or otherwise not in accordance with the law, and CalPortland reserves the right to
17  oppose this position.

18  68.    The invocation of dispute resolution procedures under this Section shall
19  not, by itself, extend, postpone, or affect in any way any obligation of CalPortland
20  under this Consent Decree, unless and until final resolution of the dispute so
21  provides. Stipulated penalties with respect to the disputed matter shall continue to
22  accrue from the first Day of noncompliance, but payment shall be stayed pending
23  resolution of the dispute as provided in Paragraph 50. If CalPortland does not
24  prevail on the disputed issue, stipulated penalties shall be assessed and paid as
25  provided in Section X (Stipulated Penalties).

26
27
28

## XIII. INFORMATION COLLECTION AND RETENTION

69.     Any authorized representative of the United States, including their attorneys, contractors, and consultants, shall have the right of entry into the Facility, at all reasonable times, upon presentation of credentials, to:

(a)     monitor the progress of activities required under this Consent Decree;

(b)     verify any data or information submitted to the United States or the State in accordance with the terms of this Consent Decree;

(c)     obtain samples and, upon request, splits of any samples taken by CalPortland or its representatives, Contractors, or consultants;

(d)     obtain copies of any documents, including photographs and similar data; and,

(e)     assess CalPortland's compliance with this Consent Decree.

70.     Until five years after the termination of this Consent Decree, CalPortland shall retain, and shall instruct its Contractors and agents to preserve, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in its or its Contractors' or agents' possession or control, or that come into its or its Contractors' or agents' possession or control, and that relate in any manner to CalPortland's performance of its obligations under this Consent Decree. This information-retention requirement shall apply regardless of any contrary corporate or institutional policies or procedures. At any time during this information-retention period, upon request by the United States, CalPortland shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

71.     At the conclusion of the information-retention period provided in Paragraph 70, CalPortland shall notify the United States at least 90 Days prior to the destruction of any documents, records, or other information subject to the requirements of the preceding Paragraph 70, and, upon request by the United States,

1  CalPortland shall deliver any such documents, records, or other information to EPA.
2  CalPortland may assert that certain documents, records, or other information are
3  privileged under the attorney-client privilege or any other privilege recognized by
4  federal law. If CalPortland asserts such a privilege, it shall provide the following:
5  (1) the title of the document, record, or information; (2) the date of the document,
6  record, or information; (3) the name and title of each author of the document,
7  record, or information; (4) the name and title of each addressee and recipient; (5) a
8  description of the subject of the document, record, or information; and, (6) the
9  privilege asserted by CalPortland. However, no documents, records, or other
10  information created or generated pursuant to the requirements of this Consent
11  Decree shall be withheld on grounds of privilege.

12      72.  CalPortland may also assert that information required to be provided
13  under this Consent Decree is protected as Confidential Business Information
14  ("CBI") under 40 C.F.R. Part 2. As to any information that CalPortland seeks to
15  protect as CBI, CalPortland shall follow the procedures set forth in 40 C.F.R. Part 2.

16      73.  This Consent Decree in no way limits or affects any right of entry and
17  inspection, or any right to obtain information, held by the United States pursuant to
18  applicable laws, regulations, or permits, nor does it limit or affect any duty or
19  obligation of CalPortland to maintain documents, records, or other information
20  imposed by applicable federal or State laws, regulations, or permits.

21      **XIV. EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS**

22      74.  This Consent Decree resolves the civil claims of the United States
23  against CalPortland for the violations alleged in the Complaint filed in the action
24  through the Date of Lodging. The United States reserves all legal and equitable
25  remedies available to enforce the provisions of this Consent Decree, except as
26  expressly stated in Paragraph 74. This Consent Decree shall not be construed to
27  limit the rights of the United States to obtain penalties or injunctive relief under the
28  Act or implementing regulations, or under other federal or state laws, regulations, or

1 permit conditions, except as expressly specified in Paragraph 74. The United States
2 further reserves all legal and equitable remedies to address any imminent and
3 substantial endangerment to the public health or welfare or the environment arising
4 at, or posed by, the Facility, whether related to the violations addressed in this
5 Consent Decree or otherwise.

6      75.    In any subsequent administrative or judicial proceeding initiated by the
7 United States for injunctive relief, civil penalties, other appropriate relief relating to
8 the Facility or CalPortland, CalPortland shall not assert, and may not maintain, any
9 defense or claim based upon the principles of waiver, *res judicata*, collateral
10 estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based
11 upon any contention that the claims raised by the United States in the subsequent
12 proceeding were or should have been brought in the instant case, except with respect
13 to claims that have been specifically resolved pursuant to Paragraph 74 of this
14 Section.

15      76.    This Consent Decree is not a permit, or a modification of any permit,
16 under any federal, State, or local laws or regulations. CalPortland is responsible for
17 achieving and maintaining complete compliance with all applicable federal, State,
18 and local laws, regulations, and permits; and CalPortland's compliance with this
19 Consent Decree shall be no defense to any action commenced pursuant to any such
20 laws, regulations, or permits, except as set forth herein. The United States does not,
21 by its consent to the entry of this Consent Decree, warrant or aver in any manner
22 that CalPortland's compliance with any aspect of this Consent Decree will result in
23 compliance with provisions of the Clean Air Act, 42 U.S.C. § 7401 *et seq.*, or with
24 any other provisions of federal, State, or local laws, regulations, or permits.

25      77.    This Consent Decree does not limit or affect the rights of CalPortland
26 or of the United States against any third parties, not party to this Consent Decree,
27 nor does it limit the rights of third parties, not party to this Consent Decree, against
28 CalPortland, except as otherwise provided by law.

1      78.    This Consent Decree shall not be construed to create rights in, or grant

2 any cause of action to, any third party not party to this Consent Decree.

3
## XV. COSTS

4      79.    The Parties shall bear their own costs of this action, including attorneys'

5 fees, except that the United States shall be entitled to collect the costs (including

6 attorneys' fees) incurred in any action necessary to collect any portion of the civil

7 penalties or stipulated penalties due but not paid by CalPortland.

8
## XVI. NOTICES

9      80.    Unless otherwise specified herein, whenever notifications, submissions,

10 or communications are required by this Consent Decree, they shall be made in

11 writing and addressed as follows:

12

13      As to EPA:

14          (If by first class mail)

15          Director, Air Enforcement Division

16          Environmental Protection Agency

          MC 2242A

17          1200 Pennsylvania Ave. NW

18          Washington, D.C. 20460

          Fax: (202) 564-0015

19

20          (If by commercial delivery service)

21          Director, Air Enforcement Division

22          Environmental Protection Agency

          1200 Pennsylvania Avenue, N.W.

23          Ariel Rios South Building, Room 1119

24          Washington, D.C. 20004

25

26

27

28

1    Charles Aldred
     Air Division
2    Environmental Protection Agency, Region 9
3    Mail Code AIR-5
     75 Hawthorne Street
4    San Francisco, CA  94105
5

6
     As to the United States – to the EPA addressees above and to:
7
     Chief, Environmental Enforcement Section
8    Environment and Natural Resources Division
9    Department of Justice
     Box 7611 Ben Franklin Station
10   Washington, D.C.  20044-7611
11   Re: DOJ No. 90-5-2-1-08990

12        and

13   As to CalPortland:

14   John H. Renninger
15   Senior Vice President and General Counsel
     CalPortland Company
16   2025 E. Financial Way, Suite 200
17   Glendora, CA  91741

18   Bruce Shafer
19   Plant Manager, Mojave Cement Plant
     CalPortland Company
20   9350 Oak Creek Road
     Mojave, CA  93502
21

22   Randolph C. Visser, Esq.
     Sheppard, Mullin, Richter & Hampton LLP
23   333 S. Hope Street, 43rd Floor
24   Los Angeles, CA  90071

25        81.    Any Party may, by written notice to the other Parties, change its

26   designated notice recipient or notice address provided above.

27

28

1     82.   Notices submitted pursuant to this Section shall be deemed submitted
2 upon mailing, unless otherwise provided in this Consent Decree or by mutual
3 agreement of the Parties in writing.

## XVII. EFFECTIVE DATE

5     83.   The Effective Date of this Consent Decree shall be the date upon which
6 this Decree is entered by the Court or a motion to enter the Consent Decree is
7 granted, whichever occurs first.

## XVIII. RETENTION OF JURISDICTION

9     84.   The Court shall retain jurisdiction over this case until termination of
10 this Consent Decree, for the purpose of resolving disputes arising under this Decree
11 or entering orders modifying this Decree, pursuant to Sections XII (Dispute
12 Resolution) and XIX (Modification), or effectuating or enforcing compliance with
13 the terms of this Decree.

## XIX. MODIFICATION

15     85.   The terms of this Consent Decree, including attached Exhibit A, may
16 be modified only by a subsequent written agreement signed by the Parties. Where
17 the modification constitutes a material change to this Consent Decree, it shall be
18 effective only upon approval by the Court.

19     86.   Any disputes concerning modification of this Consent Decree shall be
20 resolved pursuant to the Section XII (Dispute Resolution) provisions of this Consent
21 Decree, provided, however, that, instead of the burden of proof provided by
22 Paragraph 67, the Party seeking the modification bears the burden of demonstrating
23 that it is entitled to the requested modification in accordance with Federal Rules of
24 Civil Procedure 60(b).

## XX. TERMINATION

26     87.   After CalPortland has satisfied the requirements of Section V
27 (Compliance Requirements), has obtained a federally enforceable permit or SIP
28 revisions referenced in Section VII (Permits) of this Decree, has maintained

1  Continuous Operation of the SNCR and LIS as required by this Consent Decree for
2  a period of 2 years after determination of the final Emission Limits in accordance
3  with Section V.B. of this Consent Decree (including any period required for Dispute
4  Resolution) and Exhibit A or has maintained Continuous Operation of an alternative
5  pollution control technology for a period of 2 years after such control technology's
6  approval pursuant to Paragraph 24, has fulfilled all other requirements of this
7  Consent Decree, and has paid the civil penalty and any accrued stipulated penalties
8  as required by this Consent Decree, CalPortland may serve upon the United States a
9  Request for Termination, stating that CalPortland has satisfied those requirements,
10 together with all necessary supporting documentation.

11     88.   Following receipt by the United States of CalPortland's Request for
12 Termination, the Parties shall confer informally concerning the Request and any
13 disagreement that the Parties may have as to whether CalPortland has satisfactorily
14 complied with the requirements for termination of this Consent Decree.  If the
15 United States agrees that the Decree may be terminated, the Parties shall submit, for
16 the Court's approval, a joint stipulation terminating the Decree.

17     89.   If the United States does not agree that the Decree may be terminated,
18 CalPortland may invoke the Section XII (Dispute Resolution) provisions of this
19 Consent Decree.  However, CalPortland shall not seek Dispute Resolution of any
20 dispute regarding termination under Paragraph 63 (Formal Dispute Resolution) of
21 Section XII (Dispute Resolution) of this Consent Decree until 60 Days after service
22 of its Request for Termination.

23                    **XXI. PUBLIC PARTICIPATION**

24     90.   This Consent Decree shall be lodged with the Court for a period of not
25 less than 30 Days for public notice and comment in accordance with 28 C.F.R. §
26 50.7. The United States reserves the right to withdraw or withhold its consent if the
27 comments regarding the Consent Decree disclose facts or considerations indicating
28 that the Decree is inappropriate, improper, or inadequate.  CalPortland consents to

1 | entry of this Consent Decree without further notice and agrees not to withdraw from
2 | or oppose entry of this Consent Decree by the Court or to challenge any provision of
3 | the Decree, unless the United States has notified CalPortland in writing that it no
4 | longer supports entry of the Decree.

## XXII. SIGNATORIES/SERVICE

6 | 91.    Each undersigned representative of CalPortland and the Assistant
7 | Attorney General for the Environment and Natural Resources Division of the
8 | Department of Justice certifies that he or she is fully authorized to enter into the
9 | terms and conditions of this Decree and to execute and legally bind the Party he or
10 | she represents to this document.

11 | 92.    This Consent Decree may be signed in counterparts, and its validity
12 | shall not be challenged on that basis.  CalPortland agrees to accept service of
13 | process by mail with respect to all matters arising under or relating to this Consent
14 | Decree and to waive the formal service requirements set forth in Rules 4 and 5 of
15 | the Federal Rules of Civil Procedure and any applicable Local Rules of this Court
16 | including, but not limited to, service of a summons.  CalPortland shall identify, on
17 | the attached signature page, the name, address and telephone number of an agent
18 | who is authorized to accept service of process by mail on behalf of CalPortland with
19 | respect to all matters arising under or relating to this Consent Decree.  All Parties
20 | agree that CalPortland need not file an answer to the Complaint in this action unless
21 | or until the Court expressly declines to enter this Consent Decree.

## XXIII. INTEGRATION

23 | 93.    This Consent Decree constitutes the final, complete, and exclusive
24 | agreement and understanding among the Parties with respect to the settlement
25 | embodied in the Decree and supersedes all prior agreements and understandings,
26 | whether oral or written, concerning the settlement embodied herein. Other than
27 | deliverables that are subsequently submitted and approved pursuant to this Decree,
28 | no other document, nor any representation, inducement, agreement, understanding

1 | or promise constitutes any part of this Decree or the settlement it represents, nor
2 | shall it be used in construing the terms of this Decree.

3 | ## XXIV.  **FINAL JUDGMENT**

4 |       94.    Upon approval and entry of this Consent Decree by the Court, this
5 | Consent Decree shall constitute a final judgment of the Court as to the United States
6 | and CalPortland. The Court finds that there is no just reason for delay and therefore
7 | enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.

8 | ## XXV.  **EXHIBITS**

9 |       95.    The following exhibit is attached to and made part of this Consent
10 | Decree:

11 |     Exhibit A:  Control Technology Demonstration Requirements

12 | Dated and entered this *5th* day of *February* *2012*

13 |

14 |

15 |                   _____

16 |                   UNITED STATES DISTRICT COURT JUDGE
                  Eastern District of California

17 |
18 |
19 |
20 |
21 |
22 |
23 |
24 |
25 |
26 |
27 |
28 |

1 │ Signature Page for *United States of America. v. CalPortland Company* Consent
2 │ Decree

3 │ FOR THE UNITED STATES OF AMERICA

4 │

5 │ /s/ Ignacia S. Moreno                          Date:  12/9/11

6 │ IGNACIA S. MORENO
    │ Assistant Attorney General
7 │ Environment and Natural Resources Division
8 │ United States Department of Justice

9 │

10 │ /s/ Ivan Lieben                               Date:  12/13/11
11 │ IVAN LIEBEN
12 │ Special Attorney
    │ Environmental Enforcement Section
13 │ Environment and Natural Resources Division
14 │ United States Department of Justice
    │ P.O. Box 7611
15 │ Washington, D.C.  20044-7611
16 │ (202) 305-0260 (Tel.)
    │ (202) 514-8395 (Fax)
17 │ laura.thoms@usdoj.gov
18 │
19 │
20 │
21 │
22 │
23 │
24 │
25 │
26 │
27 │
28 │

CONSENT DECREE -44-

1 Signature Page for *United States of America. v. CalPortland Company* Consent
2 Decree

3 FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

4

5 /s/ Cynthia Giles                                      Date: 11/10/11

6 CYNTHIA GILES
   Assistant Administrator
7 Office of Enforcement and Compliance
   Assurance
8 United States Environmental Protection Agency

9

10

11 /s/ Adam M. Kushner                               Date: 11/1/11

12 ADAM M. KUSHNER
   Director, Office of Civil Enforcement
13 Office of Enforcement and Compliance
   Assurance
14 United State Environmental Protection Agency

15

16

17 /s/ Phillip A. Brooks                               Date: 10/24/11

18 PHILLIP A. BROOKS
   Director, Air Enforcement Division
19 Office of Enforcement and Compliance
   Assurance
20 United States Environmental Protection Agency

21

22

23 /s/ Melanie Shepherdsen                        Date: 10/19/11

24 MELANIE SHEPHERDSEN
   Attorney, Air Enforcement Division
25 Office of Enforcement and Compliance
   Assurance
26 United States Environmental Protection Agency

27

28

1  Signature Page for *United States of America. v. CalPortland Company* Consent

2  Decree

3  FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

4

5  /s/ Jared Blumenfeld _____     Date:  11/22/11 _____

6  JARED BLUMENFELD
   Regional Administrator
7  United States Environmental Protection Agency
8  Region 9
   75 Hawthorne Street
9  San Francisco, California 94105

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1 | Signature Page for *United States of America. v. CalPortland Company* Consent

2 | Decree

3 | FOR CALPORTLAND COMPANY

4 |

5 | /s/ Rick Patton                                    Date: 10/21/11

6 | RICK PATTON
Senior Vice President

7 | CalPortland Company

8 | 2025 E. Financial Way, Ste. 200
Glendora, CA 91741

9 |

10 |

11 |

12 | The following is the name and address of Defendant CalPortland's agent for service

13 | pursuant to Paragraph 80:

14 | John H. Renninger, Esq.
Senior Vice President and General Counsel

15 | CalPortland Company

16 | 2025 E. Financial Way, Ste. 200
Glendora, CA 91741

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

1  **Exhibit A to Consent Decree:**

2  **Control Technology Demonstration Requirements**

3

4  **I.    Scope and Applicability**

5      1.    CalPortland shall comply with the requirements contained in this
Exhibit A for implementing combustion and process optimization measures
6  ("Control Technology Optimization Measures") and in proposing and establishing
7  30-Day Rolling Average Emission Limits for Nitrogen Oxide ("$NO_x$") and Sulfur
Dioxide ("$SO_2$") for its Mojave, California cement manufacture plant (the
8  "Facility").

9      2.    For purposes of this Technology Demonstration, Control Technology
10 Optimization Measures do not include rebuilding or reconstructing (within the
meaning of 40 C.F.R. Part 60) the Kiln, or calciner, or installing selective catalytic
11 reduction technology.

12     3.    CalPortland may schedule and implement its $NO_x$ and $SO_2$ control
13 compliance requirements provided for in Section V of the Consent Decree and this
Exhibit A independently and on differing timelines, e.g., concurrent, sequential or
14 parallel but overlapping in whole or in part, provided CalPortland otherwise satisfies
15 all specified time schedules and requirements established by or approved under this
16 Decree or Exhibit A.

17     4.    CalPortland shall take the following steps to establish 30-day Rolling
Average Emission Limits for $NO_x$ and $SO_2$ at the Facility:
18

19         a.    **Design Report:** CalPortland shall prepare and submit to EPA a
Design Report for each required Control Technology for $NO_x$ and  $SO_2$,
20 namely SNCR and LIS, based on similar $NO_x$ and $SO_2$ control technology
21 installations and control requirements of this Consent Decree;

22         b.    **Baseline Data Collection**: Prior to initiating operation of any
Control Technology, CalPortland shall either: (i) collect new baseline
23 emissions and operational data for a 180-day period; or (ii) obtain EPA's
24 approval of baseline emissions and operational data from a period prior to the
date of any baseline data collection period.  Such baseline emissions and
25 operational data shall be representative of the full range of normal kiln
26 operations, including regular operating changes in raw mix chemistry due to
different clinker manufacture, changes in production levels, and operation of
27 the oxygen plants.  The baseline data collection/submittal may run
28

concurrently with other required activities identified in the Consent Decree and this Exhibit A.

c. **Optimization Program:** Following completion of installation of each Control Technology, CalPortland shall undertake a startup and optimization program for each Control Technology;

d. **Demonstration Program:** Upon completion of the startup and optimization program specified above, CalPortland shall operate each Control Technology in an optimized manner for a period of 270 Operating Days (subject to being shortened or lengthened as provided for in Paragraph 17 of the Consent Decree) for the purpose of establishing a 30-Day Rolling Average Emission Limit;

c. **Demonstration Report:** CalPortland shall prepare and submit to EPA for approval, a Final Report following completion of the Demonstration Program Period for each Control Technology used to establish 30-Day Rolling Average Emission Limits.

## II.   Design Report

5.   Within 60 days of the Effective Date of this Consent Decree, CalPortland shall submit to EPA for approval a Design Report for each Control Technology required herein, and as described below. Any permit application which may be required under state or federal law for the Control Technology shall be consistent with the Design Report. The Design Report shall be subject to the review requirements of Section VIII (Review and Approval) of the Consent Decree.

a.   Selective Non-Catalytic Reduction ("SNCR"): CalPortland shall design the SNCR system to deliver the proposed reagent to the exhaust gases at the rate of at least 1.2 mols of reagent to 1.0 mols of $NO_x$ (1.2:1 molar ratio). The system shall be designed to inject Ammonia into the kiln exhaust gas stream. CalPortland shall specify in the Design Report the reagent(s) selected, the locations selected for reagent injection, and other design parameters based on maximum emission reduction effectiveness, good engineering judgment, vendor standards, available data, kiln operability, and regulatory restrictions on reagent storage and use. Subsequent to EPA's approval of the final $NO_x$ Emission Limit, CalPortland shall have the right to use any reagent provided it continues to meet the final Emission Limit set using Ammonia.

b.   Lime Injection System ("LIS"): CalPortland shall design the LIS system to deliver the dry hydrated lime to the exhaust gases at the rate of at

least 4.0 mols of reagent to 1.0 mols of $SO_2$ (4:1 molar ratio). CalPortland shall specify in the Design Report the reagent injection location, other modifications and design parameters based on maximum emission reduction effectiveness, good engineering judgment, vendor standards, available data, and kiln operability.

**III.    Baseline Data Collection**

6.    Prior to commencement of Continuous Operation of the required Control Technology, CalPortland shall either: (a) collect new baseline emissions and operational data for a 180-day period; or (b) obtain EPA approval pursuant to Section VIII (Review and Approval) of the Consent Decree of existing baseline emissions and operational data collected from a period of time prior to the initiation of a baseline collection period. Such baseline emissions and operational data shall include the data required by Paragraph 10 below for periods of time representing the full range of normal kiln operations including changes in raw mix chemistry due to differing clinker manufacture, changes in production levels and operation of the oxygen plants. Within 45 Days following the completion of the baseline data collection period, CalPortland shall submit to EPA the baseline data collected during the Baseline Data Collection Period.

**IV.    Control Technology Startup and Optimization Period**

7.    CalPortland shall install, operate, and collect emissions data from certified $NO_x$, $SO_2$, CO CEMS, a reagent monitor and operational data prior to commencement of the Control Technology Startup and Optimization Period and consistent with the requirements of the Consent Decree.

8.    CalPortland shall install and begin operating the Control Technologies within 360 days of the Effective Date of the Consent Decree, plus any Days added pursuant to Paragraph 14 of the Consent Decree. CalPortland shall Commence Operation of each Control Technology in accordance with the final Design Report by adding reagent to the SNCR system and/or by combining reagent and kiln gases through the LIS system. The Startup of each Control Technology will include any required shakedown of newly installed equipment. Startup and optimization of the Control Technology, as required by the Optimization Protocol, shall extend for no longer than 180 Operating Days from commencement of operation of the SNCR and LIS or EPA's approval of the Optimization Protocol pursuant to Paragraph 12 of Exhibit A, whichever is latest. CalPortland will make best efforts to establish the optimized steady-state operation of each Control Technology as soon as practicable.

1      9.    During the Baseline Data and Control Technology Startup and
2  Optimization Periods, CalPortland shall operate the Kiln in a manner necessary to
   produce a quality cement clinker product.  CalPortland shall not be expected to
3  operate the Kiln within normal operating parameters during periods of Kiln
   Malfunction, Startup and Shutdown.  CalPortland shall not intentionally adjust kiln
4  operating parameters to increase the rate of emission (expressed as lb/Ton of clinker
5  produced) for $NO_x$ or $SO_2$.  Increases or variability in the Kiln feed sulfur content,
   fuel and other raw materials composition including imported raw materials,
6  resulting from the inherent variability within the onsite quarries and imported
7  materials shall not constitute an intentional increase in emission rate.

8      10.    The data to be collected during the Baseline Data and Control
9  Technology Startup and Optimization period will include the following information
   either derived from available direct monitoring or as estimated from monitored or
10  measured data:

11      a.    Kiln flue gas temperature at the inlet to the fabric filter or at the
12  Kiln stack (daily average);

13      b.    Kiln production rate in tons of clinker (daily total) by type;
14

15      c.    Raw material feed rate in tons (daily total) by type;

16      d.    Type and percentage of each raw material used and the total feed
17  rate (daily);

18      e.    NOx, $SO_2$, and CO concentrations (dry basis) and mass rates for
19  the Kiln (daily average for concentrations and daily totals for mass rates) as
   measured at the Kiln stack gas analyzer location;
20

21      f.    Flue gas volumetric flow rate (daily average in dry acfm);

22      g.    Sulfate in feed (calculated to a daily average percentage);

23      h.    Feed burnability (C3S) (at least daily).  In the event that more
24  than one type of clinker is produced, the feed burnability for each clinker type
25  will be included;

26      i.    Temperatures in or near the burning zone (by infrared or optical
27  pyrometer);

28

      j.     Kiln system fuel feed rate and type of fuel by weight or heat input rate (calculated to a daily average);

      k.     Fuel distribution, an estimate of how much is injected at each location (daily average);

      l.     Fuel sulfur percentage by weight (calculated from supplier composite as S);

      m.     Kiln amps (daily average);

      n.     Kiln system draft fan settings and primary air blower flow rates;

      o.     Documentation of any Startup, Shutdown, or Malfunction events;

      p.     An explanation of any gaps in the data or missing data; and

      q.     Amount of oxygen generated and introduced into the Kiln (lb/day)

11.    CalPortland shall submit the data to EPA in an electronic format and shall explain the reasons for any data not collected for each of the parameters. CalPortland shall report all data in a format consistent with and able to be manipulated by Microsoft Excel.

12.    Not later than 120 Days after the Effective Date of the Consent Decree, CalPortland shall submit to EPA for approval a protocol ("Optimization Protocol") for optimizing each Control Technology, including optimization of the operational parameters resulting in the minimization of emissions of $NO_x$ and $SO_2$ to the greatest extent practicable without violating any limits. This Protocol shall be subject to the review requirements of Section VIII (Review and Approval) of the Consent Decree. The Protocol shall describe procedures to be used during the Control Technology Startup and Optimization Period to optimize the different Facility processes to minimize emissions and adjust Control Technology operating parameters, and shall include the following:

      a.     The following measures to optimize the Facility's processes to reduce $NO_x$ emissions in conjunction with SNCR:

(i)     Adjustment of the balance between fuel supplied to the existing riser duct burner and the existing calciner burners to improve overall combustion within the calciner while maintaining product quality;

(ii)    Adjustments to the calciner combustion to ensure complete fuel burning, which will help to both reduce CO and improve $NO_x$ levels by, at a minimum:

1.    Adjusting fuel fineness to improve the degree of combustion completed in the calciner; and

2.    Adjusting the proportions of primary, secondary and tertiary air supplied to the kiln system while maintaining product quality; and

(iii)   Adjustments to the raw mix chemical and physical properties using onsite raw materials to improve kiln stability and maintain product quality, including but not limited to, fineness of the raw mix. As part of this optimization measure, CalPortland shall take additional measurements using existing monitoring equipment at relevant process locations to evaluate the impact of raw mix refinements.

b.     The range of reagent injection rates (as a molar ratio of the average pollutant concentration) for each Control Technology;

c.     Sampling and testing programs that will be undertaken during the initial reagent injection rate period for each Control Technology;

d.     A plan to increase the reagent injection rate for each Control Technology to identify the injection rates with the maximum emission reduction effectiveness and associated sampling and testing programs for each increase in the reagent rate. CalPortland shall test, at a minimum, for SNCR at three molar ratios of 0.75, 1.0, and 1.2, and for LIS at three molar ratios of 2.0, 3.0 and 4.0;

e.     The factors that will determine the optimum reagent injection rates and pollutant emission reductions for each Control Technology (including maintenance of Kiln, productivity, and product quality); and

1

        f.      Evaluation of any observed synergistic effects on Kiln emissions, Kiln operation, reagent slippage, or product quality from Control Technologies for $NO_x$ and $SO_2$.

2

3

4

      13.    As part of the Protocol, CalPortland shall propose a schedule for optimizing each of the Control Technology Optimization Measure parameters

5 identified in the preceding paragraph. As part of this schedule, CalPortland must

6 optimize each identified parameter for the following minimum amounts of time:

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| Pollutant | Parameter | Minimum Optimization Period (Operating Days) |
|---|---|---|
| $NO_x$ | fuel usage between riser duct burner and calciner burners | 15 |
| $NO_x$ | calciner combustion | 45 |
| $NO_x$ | raw mix chemical and physical properties stabilization | 45 |
| $NO_x$ | Setup of SNCR, initial operation of reagent injection, and calibration | 60 |
| $SO_2$ | Setup of lime injection points, initial operation, and calibration | 60 |

14.     Within 60 Days following the termination of the Control Technology Startup and Optimization Period(s), CalPortland shall submit to EPA for approval an Optimization Report demonstrating conformance with the Optimization Protocol for the Control Technologies and establishing the optimized operating parameters for the Facility processes and the Control Technologies determined under the Optimization Protocol, including optimized injection rates for all reagents. CalPortland may take into account energy, environmental, and economic impacts and other costs in proposing the optimized state of the Control Technology, including the injection rates of reagents, and the operating parameters for the Facility processes. CalPortland may also include in the Optimization Report a discussion of any problems encountered during the Optimization Period, and how that problem may impact the potential emission reductions (e.g. the quantity of reagent slip at varying injection rates and/or the possible observance of a detached plume above the Stack). The Optimization Report shall be subject to the review requirements of Section VIII (Review and Approval) of the Consent Decree.

15.     Optimization Targets: Except as otherwise provided in this Paragraph and in Paragraph 16 of this Exhibit below, LIS or SNCR shall be deemed to be optimized if the Optimization Report demonstrates that the LIS or SNCR during periods of normal operation has achieved emission reductions consistent with its maximum design stoichiometric rate identified in the Design Report approved pursuant to Paragraph 5 of this Exhibit, as applicable to the Control Technology.

16.     Notwithstanding the provisions of Paragraph 15 of this Exhibit, a Control Technology may be deemed to be optimized at a lower rate of emission reductions than that identified in Paragraph 15 of this Exhibit if the Optimization Report, as approved by EPA pursuant to Paragraph 14, demonstrates that, during periods of normal operation, a lower rate of emission reductions cannot be sustained

1  after all parameters and injection rates are optimized during the Optimization Period
2  without creating a meaningful risk of impairing product quality, impairing Kiln
3  system reliability, impairing compliance with a maximum ammonia slip emissions
   limit of 10 ppm or other permitted levels, or forming a detached plume.

4       17.    During the Control Technology Startup and Optimization Period,
5  CalPortland, to the extent practicable, shall operate the Control Technology in a
   manner consistent with good air pollution control practice consistent with 40 C.F.R.
6  § 60.11(d). CalPortland will adjust its optimization of a Control Technology as may
7  be necessary to avoid, mitigate or abate an identifiable non-compliance with an
   emission limitation or standard for pollutants other than $NO_x$, $SO_2$ or CO. In the
8  event CalPortland determines, prior to the expiration of the Optimization Period,
9  that its ability to optimize the Control Technology will be affected by potential
   impairments to product quality, kiln system reliability or increased emissions of
10 other pollutants, then CalPortland shall promptly advise EPA of this determination,
11 and include these considerations as part of its recommendation in its Optimization
   Report.
12

13 **V.    Control Technology Demonstration Period**

14      18.    The Demonstration Period shall commence within 7 days after
   CalPortland's receipt of the final approval by EPA of the Optimization Report.
15 During the Demonstration Period, CalPortland shall operate each Control
16 Technology for a period of 270 Operating Days consistent with the optimized
   operations of the Facility and the Control Technology as approved by EPA as part of
17 the of the Optimization Report. This 270 Operating Day Demonstration Period may
18 be shortened or lengthened as provided for in Paragraph 17 of the Consent Decree.

19      19.    If Kiln Operation is disrupted by excessive unplanned outages, or
20 excessive Startups and Shutdowns during the Demonstration Period, or if the Kiln
   Temporarily Ceases Operation for business or technical reasons, CalPortland may
21 request that EPA temporarily extend the Demonstration Period. EPA shall grant or
22 deny the request and shall state the amount of time, if any, that the Demonstration
   Period may be extended which decision is subject to the Section XII (Dispute
23 Resolution) provisions of this Consent Decree. CalPortland may not suspend
24 Demonstration Period data collection until and unless EPA has granted the request.
   However, data gathered during periods of disruption may not be used to determine
25 an emission limitation unless both CalPortland and EPA agree.

26      20.    If evidence arises during the Demonstration Period that product quality,
27 kiln system reliability, or emission compliance with an emission limitation or
28 standard is impaired by reason of longer term operation of a Control Technology in

a manner consistent with the parameters identified in the Optimization Report, then CalPortland may, upon notice to, and approval by, EPA, temporarily modify the manner of operation of the Facility process or the Control Technology to mitigate the effects and request that EPA suspend or extend the Demonstration Period for further technical evaluation of the effects of a process optimization or Control Technology or permanently modify the manner of operation of the Control Technology to mitigate the effects. EPA's decision in response to any such CalPortland request is subject to the Section XII (Dispute Resolution) provisions of this Consent Decree.

21. During the Demonstration Period, CalPortland shall collect the same data as required in Paragraph 10 of this Exhibit A. The Demonstration Report shall include the data collected as required in this Paragraph.

22. Within 60 Days following completion of the Demonstration Period for each Control Technology, CalPortland shall submit a Demonstration Report to EPA, based upon and including all of the data collected during the Demonstration Period including data from Startup, Shutdown and Malfunction events, that identifies proposed 30-Day Rolling Average Emission Limits for $NO_x$ and $SO_2$. Each 30-Day Rolling Average Emission Limit for $NO_x$ and $SO_2$ shall be based upon an analysis of CEMS data and clinker production data collected during the Demonstration Period, while the process and Control Technology parameters were optimized in determining the proposed final Emission Limit(s) achievable for the Facility. Total pounds of an affected pollutant emitted during an individual Operating Day will be calculated from collected CEMS data for that Day. Hours or Days when there is no Kiln Operation may be excluded from the analyses. However, CalPortland shall provide an explanation in the Demonstration Report(s) for any data excluded from the analyses. In any event, CalPortland shall include all data required to be collected during the Demonstration Period in the Final Demonstration Report(s).

23. CalPortland shall propose 30-Day Rolling Average Emission Limits for $NO_x$ and $SO_2$ in the Final Demonstration Report(s) as provided in the preceding Paragraph and in accordance with the definition of that term in the Consent Decree. The final 30-Day Rolling Average Emission Limits shall be calculated in accordance with the following formula:

$X = \mu + 1.65\sigma$ where:

$X$ = 30-Day Rolling Average Emission Limit (lb/Ton of clinker)
$\mu$ = arithmetic mean of all of the 30-Day rolling averages
$\sigma$ = standard deviation of all of the 30-Day rolling averages, as calculated in the following manner:

1

2

3

4

$$\sigma = \sqrt{\frac{1}{N}\sum_{i=1}^{N}(x_i - \bar{x})^2}$$

5

6   24.    Notwithstanding Paragraphs 22 and 23 of this Exhibit A, in no event shall the Final Emission Limits proposed in the Demonstration Report(s), be greater than as specified in Paragraph 18 (final Emission Limits) of the Consent Decree.

7

8   25.    EPA shall either approve the proposed final 30-day Rolling Average Emission Limit or establish an alternative final 30-day Rolling Average Emission Limit. If EPA establishes an alternative Final 30-day Rolling Average Emission Limit, CalPortland will begin to meet this final 30-day Rolling Average Emission Limit within 30 days of receipt of EPA's notice unless it invokes the Section XII (Dispute Resolution) provisions of this Consent Decree within that time by sending a Written Notice of Dispute in accordance with Section XVI (Notices). If CalPortland invokes Dispute Resolution, it shall follow the procedures set forth in Paragraph 61 (Informal Dispute Resolution for Emission Limit Setting Process) to hire an independent contractor to review and make a non-binding recommendation regarding the appropriate final Emission Limit.

9

10

11

12

13

14

15

16   26.    Supporting data required to be submitted under this Exhibit may contain information relative to kiln operation and production that CalPortland may consider to be proprietary. In such a situation, CalPortland may submit the information to EPA as CBI, subject to the provisions of 40 C.F.R. Part 2.

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | No. 1:11-cv-02064-AWI-JLT |
| Plaintiff, ) | |
| ) | ORDER GRANTING PLAINTIFF'S |
| v. ) | UNOPPOSED REQUEST TO |
| ) | ENTER CONSENT DECREE |
| CALPORTLAND COMPANY, ) | |
| ) | |
| Defendant. ) | |
| ) | |

Plaintiff the United States having filed an Unopposed Request to Enter Consent Decree (Doc. No. 6), and good cause appearing therefor, Plaintiff's Motion is GRANTED. The Consent Decree (Doc. No. 2, Attachment 1) will be executed and filed by the Court as a separate docket item and the Clerk shall thereafter close this file.

CASE NO. 1:11-cv-02064-AWI-JLT
ORDER GRANTING UNOPPOSED REQUEST TO ENTER CONSENT DECREE - 1